SHELDON, Appellant, vs. JOHNSTON, Respondent.

*February 8—March 9, 1943.*

For the appellant there was a brief by *McDaniel, McDaniel & Reinoehl* of Darlington, and oral argument by *C. F. McDaniel*.

For the respondent there was a brief by *Boardman & Jones* of Mineral Point, and oral argument by *David O. Jones*.

·Fritz, J.   The forty acres of land in question had been the homestead of Zylpha Johnston, the mother of the defendant Charles T. Johnston, but ever since his marriage in 1929 he

and his wife had lived with the latter's mother, Mrs. Bracken, in her home on her two-hundred-acre farm; and defendant and his wife never lived on the forty-acre farm in question. In March, 1934, Zylpha Johnston leased this farm to her son Paul, with an option to purchase it at $3,200 within one year of the mother's death; and he lived thereon continuously from March 7, 1934, to March 1, 1938. Zylpha Johnston died on August 27, 1936, and her will provided that if Paul exercised his right to purchase the farm Charles was to receive the proceeds of sale at $3,200, which were bequeathed to him; and that if Paul failed to exercise the option she devised that farm to Charles absolutely. Paul did not elect to purchase when his option expired on August 27, 1937, but until March 1, 1938, he continued to occupy the premises and lived in the house and used the barn, chicken house, corncrib, etc., thereon.

Defendant testified that when Paul started renting and moved into the house not much improvement at all had been made on the buildings; that there was the material depreciation prior to when Paul got there, but not much while he was there; that "the house isn't bad; it needs fixing," and defendant "put in some window lights and things like that that are necessary;" that "the barn is in bad shape," forty-eight years old, never reroofed, leaks terribly, and must be fixed before it is used; but that the chicken house is in good shape and used for a granary and corncrib, and they stored one thousand five hundred bushels of corn in it from both places, and have stored potatoes, oats, and grain there from the first; that the fences are not at all good, and he "has done a little fencing with the neighbors so the stock won't bother in their crops." Defendant also testified that as soon as Paul's lease expired defendant took possession of the place,—started to operate it right away,—sometime after March 1, 1938, but did not live there. "I occupied it in the way of operating it. I did not definitely go there and live." He had Mrs. Bracken's hired man, who is married, live there all the time. The hired men had the place

to live in. This hired help was employed in operating his mother-in-law's two-hundred-acre farm and in conjunction therewith the forty acres in question. The two places are separated by a town road and there are about one hundred rods between the buildings on the places. Since defendant went to Mrs. Bracken's farm in 1929, he worked there all the time and is still working there for a place to stay. He is not exactly a hired man, they are working there as a family, but he has charge of the work. Mrs. Bracken owns all the stock, farming machinery, and the necessary tools for operating the farm. They have some steers feeding on the forty acres, and a few shoats running with them, and this stock has to be cared for twice a day and defendant goes back and forth. Defendant further testified that when his mother died he was almost broke,—had a cot and a few tools, no livestock belonging to him and no funds, and did not own any bit of the personal property on Mrs. Bracken's farm; that he paid the back tax of 1935, but has not paid taxes for the years 1937 to 1941 on the forty acres; and that although neither he nor any of his family has slept there a single night, "my intentions are to live there when I possibly can. . . . I mean go there myself with my family and live there. . . . If we could get fixed up so that we could get in position so that we get the barn fixed up and the things that are necessary for me to farm I will be there any time. This thing has been holding over my head. I have been threatened so long I couldn't do it."

The trial court's conclusion that the lien of plaintiff's judgment did not attach to the forty acres, because they were the homestead of defendant at the times in question was based upon findings by the court "that on August 27, 1936 (when the defendant Johnston's mother died) and at all times since" he "had no other homestead;" that he then "lived in the home of his mother-in-law adjoining such homestead," and has continued so to live "until the time of the trial; that as soon as said Charles T. Johnston . . . knew the above-described premises

had been devised to him," and prior to entry of plaintiff's judgment on September 16, 1936, "he formed an intent to make such property his homestead and expressed such intent by overt acts;" and that he entered into occupancy thereof and used it as his homestead and prepared to make a home thereon and has been making such preparations and so using such property since March 1, 1938, when the lease of Paul Johnston expired.

Due consideration of the evidence compels the conclusion that the court's findings that defendant entered into occupancy and used the premises in question as his homestead, and prepared to make his home thereon and has been making such preparations and so using the premises since March 1, 1938, are clearly against the clear preponderance of the credible evidence. Although defendant may have had in mind, as he testified, from the time of his mother's death until his brother vacated the premises on March 1, 1938, to occupy and reside thereon as his home as soon as he was able to go into possession, the evidence conclusively establishes that when the premises became vacant on March 1, 1938, he failed to occupy them himself as his home; but, instead, allowed Mrs. Bracken's hired man to live there; and that while the latter and also while defendant's brother lived there, the house was evidently suitable for occupancy, and that although it needed some fixing, and although defendant testified at the hearing that his intentions are to live on the premises when he possibly can go there himself with his family and live, and if he could get fixed up and the things necessary for him to farm he would be there, there have been no overt acts on his part which can be considered to express or indicate a then present intention to use the premises as his homestead. On the contrary, at best, his professions as to his intention are that if he could get the barn fixed up and the things that are necessary for him to farm he would be there at any time, and "this thing has been holding over my head. I have been threatened so long I couldn't do it." Like-

wise that his intentions were but to that effect is evident from the testimony of defendant's wife, Dorothy Johnston, that she could not say when they first discussed the possibility of living on the forty acres; that they talked about painting the house and remodeling it; "but of course there wasn't any definite time that we would go up and live there;" and that they had not talked about doing any repairing of the house or barns before moving on the forty. And but likewise to that same effect is Mrs. Bracken's testimony that "when Charles thought he was going to inherit the forty acres he naturally wanted to make a home and he asked me if I would go up there and live with him and Dorothy. . . . And I said I thought for the time anyway, I would stay in my own home. It would be just about the time that all this came up, that Charles didn't seem to feel he was going up for the time, anyway."

All of that testimony clearly negatives the existence of any then present intention on the part of defendant or his family to abandon the apparently more suitable home, which they were occupying on Mrs. Bracken's farm, and to, in lieu thereof, occupy as his homestead his forty acres. In view of the facts that the absolute right to immediate and exclusive possession of the premises was vested in him at all times since March 1, 1938, that the premises were as suitable for occupancy by him as his home as they were by the hired man, whom he allowed to live thereon, and that defendant failed for over three years to so occupy the premises himself, there clearly was not any then present intention since March 1, 1938, to presently enter into occupancy thereof with his family.

Consequently, there is applicable the conclusion stated in the *Estate of Arndt*, 199 Wis. 1, 3, 225 N. W. 134, that—

"While the statutory provisions for homestead exemption have been and should be very liberally construed . . . yet in a situation such as was here presented there was lacking the prime requisite of a showing of some overt act indicating a then present intention to set aside the particular property as

and for a homestead in addition to a showing of a merely mental attitude to the same purpose."

As we held in *Petition of Robers,* 220 Wis. 547, 551, 265 N. W. 578,—"something more overt than a subsequent mere hope or vague intention on" the part of a homestead-exemption claimant to use his property as his homestead at some future time is "necessary in order to exempt it from the liens of judgments docketed in the meantime." It follows that the order under review must be reversed with directions to enter an order denying defendant's motion for an order setting aside the levy, sale, and certificate of sale of the forty acres in question, and enjoining the execution by the sheriff of a deed thereto to plaintiff.

*By the Court.*—Order reversed; and cause remanded with directions to enter in lieu thereof an order as stated in the opinion.